over 100, but how many over I'm not quite sure. Since you all started keeping track of the ones on the website, I've had about 30. Well, there he is. After you top 100, you regress. I'm still waiting for my little pen, like we get for 15 years of service in the FPD. May it please the court, Tim Crooks for the appellant, Jose Guadalupe Reyna-Esparza, and with me at council table is Evan Howes from our office, who is also on the briefs. Mr. Reyna-Esparza was convicted of one count of harboring an illegal alien in the United States, and at issue in this appeal is the four-level enhancement he got under Guideline Section 2L1.1B5B for brandishing a dangerous weapon. We submit that this case should be remanded for resentencing for either of two reasons. First, because it's at least ambiguous whether the court applied the correct legal standard in resolving the brandishing objection against Mr. Reyna-Esparza, and second, because under the correct legal standard, the facts are insufficient to establish brandishing. With respect to the first point, at sentencing, in dealing with Mr. Reyna-Esparza's objection to the brandishing enhancement, the district court did at first correctly recite the definition of brandished under the sentencing guidelines. The district court then held that the enhancement was warranted because Mr. Reyna-Esparza had one of the harbored aliens go out to his car and fetch a pellet gun, which was brought back into the house, wrapped in a shirt or a towel, and the alien gave it to Mr. Reyna-Esparza, who put it in his back waistband. Defense counsel made... But there were witnesses to that, right? There were witnesses to that. I'm kind of interrupting your line of argument, but while you're on that, I mean, I just don't see how that couldn't be brandishing. Well, I will cover that, but I want to make the point about what the district court said first, and after counsel pointed out that brandishing has to be in order to intimidate, that's when the district court made the remarks that we submit at least create ambiguity here, and this is at row up, page 139. The district court said, well, and that is, it doesn't have to be in order to intimidate, but that's what I'm saying. I'm making that finding here based on the circumstances. So the district court at least appeared to say that brandishing doesn't have to be in order to intimidate, but the guidelines specifically say that brandishing is the display of a weapon in order to intimidate, and as this court said in Fuentes-Jaimes . . . What does the balance say, but it says, but he's going to go ahead, he doesn't think it's necessary. One way to read that is that he doesn't think it's necessary, but he's going to make the finding, and he did. Well, that's one way to read it, possibly, but our point is that we don't know for sure because there's a lot of pronouns there without antecedents, so we don't know exactly what she was saying there, what Judge Alvarez was saying, and so our primary submission is that it's because it is ambiguous whether the district court applied the correct standard that the court could remand without reaching the merits, but . . . I mean, the words, I'm making that finding, isn't that the words that she used? She did say that. She said, but the problem is we don't know what that finding is referring to, and she . . . What finding could it possibly mean other than the factual finding of brandishing? Well, she could be referring to . . . Excuse me, intimidation is what I meant to say, the finding of intimidation. I'm making that finding. She could be finding it doesn't have to be in order to intimidate, which would be an error of law. Okay, but that wouldn't be a finding, that would be a conclusion. Well, perhaps that's true, but in the hurly-burly of district courts, district courts are not often as precise about the words that they use in making rulings as maybe the Court of Appeals is, but . . . Well, you give us too much credit. Well, certainly judges are usually more precise than defense counsels, but even if the court reaches the merits, we submit that the undisputed facts here, which are all in the PSR, are insufficient to establish the intent to intimidate, and again, those facts were these. Mr. Reyna tells one of the Harvard aliens, go out to my car, get my gun, which he said was a pellet gun, no evidence to the contrary. The alien goes out by himself, I think it was a man, fetches the gun, unsupervised, comes back into the house with the gun wrapped in a shirt or a towel, depending which of the two women witnesses in the PSR you go with, and then he takes the gun and puts it in his back waistband. That was what the district court rested its brandishing finding on, and we submit that that's just insufficient as a matter of law, especially when you look at the cases that this court has decided the brandishing issue in the context of alien harboring, and there's basically three unpublished decisions, but I think they show . . . they are a useful counterpoint to what happened in this case. First, we have Fuentes Jaimes, where one of the defendants displayed a gun in front of smuggled aliens right before everyone was going to a buyout, and a buyout is where the aliens are taken and their relatives or loved ones produce more money in order to secure the aliens' freedom. So right before the buyout, there's a gun, and this was a situation where money was going to be exchanged for the aliens' freedom, and they knew they would not be free to leave until the money had been paid for their release. Alcala, that was a case where a gun was displayed in a house where the aliens concededly were not free to leave, and also one of the aliens had a gun pointed at him by masked men demanding money for his release. Mendoza Rojas, the defendant displayed a weapon while participating in a roadway kidnapping of aliens, and later he took the aliens that he had kidnapped and he imprisoned them. In contrast to all these cases, in this case the aliens were not imprisoned and were not In fact, in this case, the aliens had paid somebody to smuggle the men, is that what happened? Versus the others you're talking about, where there was either some kidnapping for ransom or somebody was demanding more money before they'd be let go, those kinds of things. Exactly. Precisely. Also, further evidence along those lines, at the preliminary hearing, and the transcript of that is in the record, the case agent, HSI Agent Carrera, testified that the aliens were not being held against their will, and that's at ROA pages 90 and 91. He testified also, in fact, that sometimes neither Mr. Reyna Esparza nor any other caretaker, or coyote if you will, was present at the stash house. Sometimes the aliens were just at the stash house by themselves, which does not really bespeak an imprisonment type scenario. I'm here with a district court's finding of both intimidation, accepting that that was a finding for the moment, but that coercion and threat were not present. There was no, he said, that sentencing actually applying the brandishing enhancement, he sustained in Esparza's objection to an enhancement for involuntary detention through coercion or threat. Well, I think if you look at Judge Alvarez's ruling on that issue, it was focused more on the detention element, is the way I read it, and again, it's not perhaps a model of But then when you combine that with Agent Carrera's testimony, and this is the person who actually talked to all the material witnesses, and he testified that they weren't being held against their will, and that sometimes there was no one but the aliens at the stash house, and that was at page 90 of the record on appeal. As Judge Graves pointed out, this wasn't a situation like in the three cases I was talking about, where the aliens were being held for ransom, or they were being held pending a buyout. These aliens were simply biding their time at the stash house, waiting for a time when they could be conveniently guided through the brush and past the checkpoint, which was their goal, to go deeper into the United States. And the final point I want to make on the intimidation is that if you were trying to make a great deal of sense, to send someone unaccompanied out to the car to fetch the weapon, so that person has unfettered control over it. The tension that I perceived there was that if your people are free to go because there's no coercion, and it's not involuntary, then I guess it's not, there's some tension between that and brandishing a weapon. What's the purpose of brandishing a weapon? When people are free to come and go. Well, that's our point, is he wasn't... He had no discipline to maintain it. I think that was his comment about that. And that was the point that we want to make, is that in the Court's prior cases, where a display of a weapon is not overtly threatening, the brandishing has always been accompanied by very coercive or threatening circumstances. Like we talked about the kidnapping in Mendoza Rojas, or the buyout in Fuentes Jaimes. It's not... The Court has never upheld that enhancement in the scenario like this one, where the people are free to leave. I mean, granted, maybe Mr. Reyna Esparza wants to keep a little bit of control so they aren't drawing enforcement's attention, but ultimately, as the case agent testified, they were free to go if they wanted, it just was not in their interest to go because they wanted to wait and be smuggled by the experts deeper into the United States. So this case is different by an order of magnitude from those three cases where the Court has upheld the brandishing enhancement before. This is under clear error review in terms of the finding of facts for intimidation, right? So we would have to find that the district judge clearly erred in her ruling on this? No. Our primary submission is it's de novo review by this Court because it's the application of undisputed facts to the guidelines. Because here, all the facts are in writing in the pre-sentence report, and it was the Court simply taking sentences in the pre-sentence report and putting them together and determining whether those sentences were brandishing. That's our primary submission. We cited authorities. All right. But, I mean, brandishing may be the ultimate conclusion because that's the standard in the guideline, but intimidation is a subsidiary finding of fact that's needed for the conclusion of brandishing, isn't it? Isn't there still a raw historical fact finding in terms of intimidation? But it might be a finding, a historical fact finding, but it's a fact finding that the district court was no better equipped to make than this Court because it was all made on written findings in the pre-sentence report. This was not a case where Judge Alvarez heard testimony or had to weigh credibility. All right. I know that, but you know that our case law also says that this comes from a Supreme Court decision, as you know, that the Supreme Court told us that even though it's just a finding on paper, we still defer under the clear error standard to what the district court has said. Well, our primary submission is its de novo review, and we'd cite the Court to pages 11 and 12 of the blue brief and note 8 for the authorities to that effect, including for But even if clearly erroneous review applies, we still submit that reversal is called for for a couple of reasons, because first, it's at least arguable the district court committed an error of law in making the factual finding, and second, because that finding is on this record simply too speculative and conjectural given the facts upon which that finding purports to rest. And since my time is almost up, I would just urge that the error in this case was not harmless because without this enhancement, Mr. Reynos-Barza would have been looking at 70 to 87 months, which is way below his 108-month sentence, and the government hasn't even argued harmlessness, so we would ask the Court to vacate and remand for resentencing. All right. Thank you, Mr. Pearson. Thank you. Time for rebuttal. Mr. Pearson? Good morning, and may it please the Court, John Pearson on behalf of the United States presenting my first argument before this Court. Perhaps the best place to begin is where appellant's counsel left off, and that is the factual issue. Judge Smith is correct. It's reviewed for clear error. That's laid out in all of the cases discussing this B-5B enhancement. De novo review is not available. It's clear the appellant wants to access that standard, but it's also clear that the facts are not undisputed in this case. The aliens at the stash house were not free to leave. The appellant, especially in his reply brief, tries to compare the situation to a bus station or a way station. And while the district court did not find the two-level enhancement for involuntary detention, if you review that sentencing transcript, it's clear that the aliens were not free to leave and that the reason she didn't find that was because of the lack of coercion or threat. And if this Court reviews the PSR in this case, and in particular, I'd focus . . . The reason she didn't find involuntary detention, is that what you're saying? Yes, sir. Was the lack of coercion or threat? Lack of coercion or threat. Well, isn't that significant? I think it's significant in that it places this case in a different context from, for example, Alcala, where there was a kidnapping of the aliens. And it places this case in a different context from Fuentes, where it's a buyout situation. But it's not a situation where the aliens were free to leave. And the facts in the PSR . . . Well, we have four, in this case, who left, isn't that right? And were discovered and were allowed to leave. I think allowing them to leave is too strong of a statement. If you look at the PSR, the aliens described it as this. They faced unbearable conditions at the stash house. They climbed out of a bedroom window. When you're free to leave, you walk out the front door. They walked down the road and the appellant, who was described as furious by Ms. Barahona, one of the aliens, blocked the road with his car and hit one of them with the mirror on his car. That doesn't happen at a bus station. When he ordered them to go back to the stash house, Ms. Barahona said they refused because they feared he would punish them for trying to escape. That speaks to the mindset of the aliens in this case. And that speaks to whether or not they were free to leave. But I think on top of that, the most egregious facts in this case deal with the minor, the 14-year-old, who's identified as ERGM. The appellant in this case repeatedly sexually assaulted this individual. And when she tried to escape, she hid in the back of a U-Haul van and the defendant went in and pulled her out, along with another individual, saying that he wasn't through with them yet. That individual was clearly not free to leave. And those facts support the district court's decision that the incidents involving the firearms were done in order to intimidate. Over and above those facts, the other thing I'd like to point the court to is in paragraph 24 of the PSR, there's a statement from another witness who was interviewed. And this is Ms. Heron, where she says, the defendant brandished a handgun that he carried in his waistband to let everyone know that he was in charge of the targeted stash house. That statement alone is sufficient under the clear error standard to sustain the district court's factual finding. Now there are other facts in the record that support the district court's conclusion. Other physical contact he had, mainly with male aliens who were pulling out cell phones and trying to contact relatives, it's described as grabbing them and ruffling them and grabbing the shirt of another of those individuals. But those are simply additional facts. When you look at the interactions between the appellant and the female aliens who were being kept at the house, there was a campaign of intimidation. And if you look at the cases where this court has reviewed the B-5B enhancements, both in Fuentes and Mendoza, this court has said that those enhancements were proper in those cases based on the totality of the circumstances surrounding the offense. And when you look at the totality of the circumstances surrounding this offense, it's clear that the district court did not err, much less did not clearly err in finding that the possession and the display or making known was done in order to intimidate. All right, thank you, Mr. Pearson. Thank you, Mr. Chief. Thank you, Justice Crooks. Seems to me that the argument you're making, Mr. Crooks, sort of cuts the other way. That is, I mean, you're suggesting that they were not being restrained or confined in a way that might have been true in some other cases and therefore it isn't intimidation. But it seems to me the reason it might cut the other way or the reason the district judge might find that it cuts the other way is if it's a looser situation at the stash house in terms of, at this house in terms of ability to come and go, then just having a weapon present keeps people from thinking that they can leave despite the fact that they may not be physically constrained by locked doors or bars or something else. So that the act of sending someone visibly out to the car to get the weapon and bring it back lets everyone know that, okay, there are limits to what you can do here in terms of leaving. Well, I have a couple of answers to that, Judge. The first is that to the extent the district court did rest its reasoning on that, it's just speculation. As she herself acknowledged, there are plenty of other reasons you might have a gun. In the brush, you might need it for snakes, you might need it for coyotes, you might need it to protect yourself from people who might come in and try to kidnap the aliens and take away the people that you're going to guide through. What kind of weapon was it? It was a pellet gun. Coyote? Well, to scare it away. It's not going to kill it. But the other point I wanted to make is if this gun was truly being used to intimidate, why is there only this one incident where the gun was there? The government alluded to a couple of incidents where the four aliens were, quote, unquote, escaping. We submit they weren't escaping, they were leaving. Mr. Reyna Esparza hit them accidentally. That's what the PSR says. He hit one of them accidentally with a rear view mirror and she had at most a little bruise but it was accidental. They weren't escaping but they were leaving but it was from upstairs windows? I don't understand that. It was ground floor windows, I think. But what they said was part of the reason they did that is they didn't want the others to know about it. But you've got to keep in mind, Mr. Reyna Esparza and the other caretakers often weren't even there. I would suspect that that was an incident where no one was even there. They just left. And he happens to drive by on the road and see them. And he wants them to go back because he doesn't want a whole lot of attention to be drawn. But ultimately, he did let them go on their way. He tried to get them to get in the minivan and go back to the house. They wouldn't do it. They went on their way. Significantly, at no point during that encounter did that gun come out. And that's exactly when you would expect it to come out if it were going to be used to intimidate. What about the sexual assault incident that Mr. Pearson referred to? Well, there was evidence that on four occasions, Mr. Reyna Esparza had sex with a 14-year-old. This was done at the Motel 6 where Mr. Reyna Esparza and the other caretaker of the house stayed. They didn't actually stay in the stash house. And two of the female Harvard aliens were brought to the motel. And each one had sex with one of them. But it's also significant. At no time do we hear that 14-year-old say that she ever saw a gun. Again, if the gun is being used to intimidate, why wouldn't it be brought out at that point? She clearly didn't want to have sex, so you would expect it to be used to overcome resistance. Doesn't come out. And finally, I do want to address the point the government made in about Sandra Heron in paragraph 24 of the PSR. There is something in there that says she said that Mr. Reyna Esparza brandished the firearm and to kind of like throw his weight around. First off, we know for sure Sandra Heron did not literally say that because she doesn't speak English. So where that brandished word came from, we don't know. Second, it's likely she was referring only to the incident, the one incident we know about, which is the incident where the alien was sent out to the car to get the gun and brought it back in. Because both Ms. Heron and Ms. Herrera testified in the PSR about that incident and they differed only in what the gun was wrapped in. So we would submit that this is just a case where there's too little evidence to support the brandishing finding, given everything that we've discussed. And all the differences from the three cases that we've talked about. And we would ask the court to reverse. All right, thank you. Thank you.